UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MANUEL C., <br><br> Plaintiff, <br><br> v. <br><br> MARTIN O'MALLEY, <br> COMMISSIONER OF SOCIAL SECURITY,[1] <br><br> Defendant. | No. 20 CV 5525 <br><br> Magistrate Judge McShain |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Manuel C. brings this action for judicial review of the Social Security Administration's (SSA) decision denying his applications for benefits. For the following reasons, plaintiff's motion to reverse and remand the SSA's decision [19][2] is denied, the Commissioner of Social Security's motion to affirm the ALJ's decision [24] is granted, and the decision denying plaintiff's applications for benefits is affirmed.

**Background**

**A.    Procedural Background**

In July 2017, plaintiff filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income, both alleging a disability onset date of August 31, 2018. [18-1] 14. The applications were denied initially and on reconsideration. [*Id.*]. Plaintiff requested a hearing, which was held by an administrative law judge (ALJ) on February 26, 2019. In a written decision dated August 30, 2019, the ALJ found that plaintiff was not disabled and denied his applications. [*Id.*] 14-30. The Appeals Council denied review in July 2020 [*id.*] 1-6, making the ALJ's decision the agency's final decision. *See* 20

---

[1] In accordance with Fed. R. Civ. P. 25(d), Martin O'Malley, the current Commissioner of Social Security, is substituted as the defendant in this case in place of the former Commissioner of Social Security, Andrew Saul.

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except for citations to the administrative record [18], which refer to the page numbers in the bottom right corner of each page.

C.F.R. §§ 404.955 & 404.981. Plaintiff then appealed to this Court [1], and the Court has subject-matter jurisdiction over the appeal pursuant to 42 U.S.C. § 405(g).[3]

### B.     The ALJ's Decision

The ALJ reviewed plaintiff's disability claim in accordance with the SSA's five-step sequential-evaluation process. At step one of his decision, the ALJ found that plaintiff had not engaged in substantial gainful activity since his alleged onset date. [18-1] 17. At step two, the ALJ determined that plaintiff suffered from three severe impairments: carpal tunnel syndrome, inflammatory bowel disease, and obesity. [*Id.*]. The ALJ rejected plaintiff's claim that his left knee osteoarthritis and depression also constituted severe impairments. [*Id.*] 17-21. At step three, the ALJ ruled that plaintiff's impairments did not meet or equal the severity of a listed impairment. [*Id.*] 22-23. Before turning to step four, the ALJ determined that plaintiff had the residual functional capacity (RFC) to perform light work, provided that (1) pushing, pulling, and using foot controls were limited by the weight limits for light lifting and carrying; (2) plaintiff could push and pull on the left only occasionally; (3) plaintiff was limited to frequent overhead reaching and all other reaching bilaterally; (4) plaintiff can only occasionally finger and handle bilaterally; and (5) plaintiff should avoid concentrated exposure to extreme cold, pulmonary irritants, operational control of moving machinery, and unprotected heights. [*Id.*] 23-28. At step four, the ALJ found that plaintiff could not perform his past relevant work as a cleaner II, accessory installer, car cleaner, and car wash attendant. [*Id.*] 28. At step five, the ALJ ruled that a significant number of jobs existed in the national economy that plaintiff could perform, such as food distributor (1,758 jobs), counter clerk (11,843 jobs), and rental furniture clerk (52,067 jobs). Accordingly, the ALJ found that plaintiff was not disabled.

## Legal Standard

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled, the ALJ conducts a sequential five-step inquiry: (1) whether the claimant is unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any listed impairments; (4) whether the claimant is unable to perform her past relevant work; and (5) whether the claimant is unable to perform any other available work in light of her age, education, and work experience.

---

[3] The parties have consented to the exercise of jurisdiction in this case by a United States Magistrate Judge. [6].

*See* 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

The Court reviews the ALJ's decision deferentially to determine if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019)). But the standard "is not entirely uncritical. Where the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Brett D. v. Saul*, No. 19 C 8352, 2021 WL 2660753, at *1 (N.D. Ill. June 29, 2021) (internal quotation marks and citation omitted).

## Discussion

### I. The ALJ Reasonably Determined That Plaintiff's Left-Knee Osteoarthritis Caused No Work-Related Limitations.

Plaintiff first argues that the ALJ erred by determining that his left-knee impairment was not a severe impairment and by failing to include any knee-related restrictions in the RFC determination. [19] 8. The Court rejects this argument for two reasons. First, "because the ALJ found at step two of [his] analysis that plaintiff had at least one severe impairment and continued with the remainder of the five-step analysis," the ALJ's decision that plaintiff's left-knee impairment was not severe was not a legal error. *Frank R. v. Kijakazi*, No. 19 CV 3223, 2021 WL 4264386, at *6 (N.D. Ill. Sept. 20, 2021). Second, and in any event, substantial evidence supported the ALJ's decision that plaintiff's left-knee impairment caused no work-related limitations.

#### A. There Was No Error At Step Two.

"Procedurally, the ALJ is required to determine at step two of the sequential analysis whether the claimant in fact has an impairment or combination of impairments that is 'severe.'" *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010). "A severe impairment is an impairment or combination of impairments that 'significantly limits [one's] physical or mental ability to do basic work activities.'" *Id.* (quoting 20 C.F.R. § 404.1520(c)) (brackets in original). "As long as the ALJ determines that the claimant has one severe impairment, the ALJ will proceed to the remaining steps of the evaluation process." *Id.* at 926-27 (citing 20 C.F.R. § 404.1523). "[T]he step two determination of severity is merely a threshold requirement." *Id.* (internal quotation marks omitted). "Accordingly, if an ALJ determines there exists

at least one severe impairment, there technically is no legal error at step two." *Frank R.*, 2021 WL 4264386, at *6 (internal quotation marks omitted).

Here, the ALJ found that plaintiff had multiple severe impairments and continued with the five-step analysis. [18-1] 17-22. Therefore, no legal error occurred when the ALJ ruled that plaintiff's left-knee impairment was not a severe impairment. *See Curvin v. Colvin*, 778 F.3d 645, 649 (7th Cir. 2015) (ALJ's finding that plaintiff had at least one severe impairment represents "as favorable a determination as can be made" at step two); *see also Frank R.*, 2021 WL 4264386, at *7.

To be sure, an ALJ must consider all of a claimant's impairments–including those that the ALJ deems non-severe–along with the objective medical evidence, the claimant's symptoms, and the claimant's credibility when making an RFC determination. *See Curvin*, 778 F.3d at 649. And the Court recognizes that "an ALJ's failure to address impairments at step two can be a harbinger of errors beyond step two because the ALJ may then fail to address whether the impairments she found were not severe . . . cause limitations in work capacity for purposes of formulating an RFC and then deciding whether the claimant can work." *Leslie T. v. Saul*, Case No. 4:19-cv-113-SEB-DML, 2020 WL 6586658, at *3 (S.D. Ind. Oct. 19, 2019). In this case, however, the ALJ adequately explained why plaintiff's left-knee impairment did "not significantly limit the claimant's ability to perform basic work activities," and substantial evidence supports his decision to include no left-knee-related limitations in the RFC determination.

### B. Substantial Evidence Supported The ALJ's Decision To Include No Left-Knee-Related Limitations In The RFC.

In deciding that plaintiff's "moderate degenerative osteoarthritic changes at the medical compartment of the left knee" did not amount to a severe impairment, the ALJ first ruled that "there is no objective evidence that the claimant has ongoing problems for a continuous period of 12 months, or that he continues to require extensive treatment due to th[is] condition[ ] during the alleged period of disability." [18-1] 17. The ALJ then explained why the left-knee impairment did not significantly limit plaintiff's ability to perform work-related activities:

> Concerning the knee, the claimant testified at the hearing that he has right knee arthritis (Hearing Testimony). The claimant also reported a right knee fracture and pain at the initial medical consultative examination (Exhibit 5F/1). However, he was found to have a normal gait and normal strength, though had difficulty performing special maneuvers (Exhibit 5F). In June 2018, the claimant was noted to have mild right lower extremities swelling, mild left tenderness to palpitation, yet no tenderness to palpitation to the left knee, and normal

4

>strength and intact sensation (Exhibit 11F/15). He was again noted to have left knee tenderness in November 2018, yet no swelling and full range of motion (Exhibit 15F/25). An x-ray performed on November 26, 2018 showed moderate degenerative osteoarthritic changes at the medical compartment of the left knee, though no fracture, dislocation or other acute osseous pathology was identified (Exhibit 15F/26, 37). At the April 30, 2019 consultative examination, the claimant reported left knee pain, and was noted to have a mildly antalgic gait, though could perform shallow knee squats with normal strength, stand on toes and heels and walk in tandem without difficulty (Exhibit 19F). He was also noted to have full active range of motion of both knees on exam with normal strength (Exhibit 19F/5). As such, the undersigned concludes that these impairments do not significantly limit the claimant's ability to perform basic work activities; therefore, for the purposes of this decision, the aforementioned impairments are non-severe. Nevertheless, pursuant to SSR 96-8p, the undersigned has accounted for all of the claimant's severe and non-severe medically determinable impairments when assessing the residual functional capacity.

[*Id.*] 17-18.

Plaintiff concedes that "[t]he ALJ acknowledged [his] knee issue" and "recit[ed] the longitudinal problems" that he reported, but plaintiff faults the ALJ for "fail[ing] to address the contradictory findings" relating to his ability to stand and walk that were made during a post-hearing consultative examination. [19] 9. On April 30, 2019, Dr. Margaret Grano examined plaintiff relating to his "chief complaints" of carpal tunnel syndrome in both wrists, a fractured rib, and gastrointestinal problems. [18-1] 797. Dr. Grano noted that plaintiff's gait was "mildly antalgic" and that, despite "complaining of left knee pain," plaintiff could perform shallow knee squats with normal strength and stand on toes and heels and walk in tandem without difficulty. [*Id.*] 799. Grano further opined that plaintiff could stand for five hours "at one time without interruption" but could stand only four hours "total in an 8 hour work day," and that he could walk for one hour without interruption and for two total hours during a work day. [*Id.*]. Plaintiff argues that the ALJ needed to resolve the "paradox" that arose based on Grano's opinion that plaintiff could stand for five hours at a time and her subsequent conclusion that he could stand for only four hours during a workday. [19] 9. Plaintiff also contends that "any time spent walking with an antalgic gait calls into question the ALJ's . . . assignment of a light exertional capacity[.]" [*Id.*] 10.

Contrary to plaintiff's argument, the ALJ specifically addressed Dr. Grano's opinion in finding that plaintiff could perform light work with certain exertional and environmental restrictions:

5

> In addition, Dr. Grano at the internal medicine consultative examination in April 2019 opined the claimant would be limited to lifting and carrying 21 to 50 lbs. occasionally on the right; could sit for 8 hours, stand for 5 hours, and walk for an hour and does not use a cane for ambulation (Exhibit 19F). * * * In addition the limitations attributed to knee pain, including the postural and environmental issues, are inconsistent with Dr. Grano's own examination findnigs [*sic*] that he could perform shallow knee squats with normal strength, stand on toes and heels and walk in tandem without difficulty (Exhibit 19F). He was also noted to have full active range of motion of both knees on exam with normal strength (Exhibit 19F/5).

[18-1] 27-28.

There is no merit to plaintiff's claim that the ALJ failed to resolve the "paradox" created by Dr. Grano's opinion. The ALJ specifically found that "the limitations attributed to knee pain, including the postural and environmental issues," were "inconsistent" with Grano's own findings during the consultative exam. [18-1] 27. The ALJ accurately observed that, during this exam, plaintiff performed shallow knee squats with normal strength, had "full active range of motion" and "normal strength" on both knees, and could stand on his toes and heels and walk in tandem without difficulty. This was substantial evidence on which the ALJ could have based his determination to include no left-knee-related restrictions in the RFC.

Furthermore, while plaintiff contends that his antalgic gait "calls into question" his ability to do light work, plaintiff does not explain why this is so or cite any evidence relating to his gait that the ALJ failed to consider. An antalgic gait "is a limp adopted so as to avoid pain on weight-bearing structures," *Stephens v. Colvin*, No. 14-cv-3117, 2016 WL 1271050, at *4 (N.D. Ill. Mar. 29, 2016). As the ALJ noted, plaintiff appeared for the April 2019 consultative exam with only a "mildly" antalgic gait [18-1] 799, and Dr. Grano's findings suggest that plaintiff's gait did not impair his ability to use his left knee for work-related activities. What's more, plaintiff presented for an earlier consultative exam, in October 2017, where his gait was "normal without the use of an assistive device." [18-1] 457. The ALJ was in the best position to evaluate this evidence, and plaintiff has not cited any evidence that the ALJ failed to consider or that would have supported a knee-related restriction in the RFC. *See Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022) ("Crucially, however, an ALJ need only include limitations that are supported by the medical record."). Plaintiff's first ground for reversal and remand is therefore denied.

**II. The ALJ Reasonably Determined That Plaintiff's Depression Caused No Work-Related Limitations.**

Plaintiff next argues that the ALJ erred in finding that his depression was not a severe impairment. [19] 10. Plaintiff contends that the ALJ "compounded this error by failing to account for any limitations arising from [his] documented depression." [*Id.*]. The Court rejects this argument for the same reasons as it rejected plaintiff's first ground for reversal: any error in failing to determine that plaintiff's depression was a severe impairment was not a legal error, *see Frank R.*, 2021 WL 4264386, at *6; and substantial evidence supported the ALJ's determination that plaintiff's depression did not cause work-related mental limitations.

The ALJ provided a lengthy and exhaustive explanation for why he did not find plaintiff's depression to be a severe impairment and, further, why he concluded that plaintiff's depression caused no work-related limitation:

> The claimant's medically determinable mental impairment of depression also does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore nonsevere. The claimant reported depression despite the use of medication prescribed by a psychiatrist and therapy (Hearing Testimony). He reported that he will get into confrontations with others when riding the CTA Blue Line train at night (Id.). Exams in June and August 2017 noted no signs of a memory impairment with the claimant demonstrating a normal mood, affect, and behavior (Exhibit 1F/7; 3F/15, 18, 21, 23, 26; 4F/10). Reviews of systems also noted he was negative for confusion and decreased concentration (Exhibit 3F/18, 25). At the internal medicine[ ]consultative examination on October 23, 2017, the claimant was noted to be appropriate, polite, pleasant and cooperative, and able to relate clear, concise, coherent medical history without apparent cognitive difficulties. Her [*sic*] affect was normal without signs of depressive disorder and without signs of agitation, irritability or anxiety. Hygiene and grooming were good, and overall effort and cooperation were good (Exhibit 5F). The claimant has also received therapy for substance use issues, though was noted to be hopeful and attentive in sessions with a calm demeanor (Exhibit 14F/49-50).
>
> The claimant underwent a psychological consultative examination on January 17, 2018 with Kathryn J. Wheeler Ph.D. who assessed an unspecified depressive disorder (Exhibit 6F). The mental status exam noted the claimant was marginally kempt and dysphoric in mood, though he was also noted to have "possibly questionable reliability" (Exhibit 6F/2). There was no signs of tremor or restlessness, his speech was coherent and intelligible, and eye contact was appropriate (Id.). The

claimant reported he arrived by train, was self-sufficient for personal care, could do simple tasks on the computer, could perform his own shopping, and was currently looking for work (Exhibit 6F/2-3). Both the internal medicine and the psychological consultative examinations opined that the claimant has the ability to assume responsibility for the management of their own funds, if granted, which the undersigned finds reflects an opinion that the claimant retains a measure of functional ability, despite the allegations of depression (Exhibit 5F; 6F). The ability to manage one's own funds effectively, particularly in cases that may involve granting a relatively large sum of money to an individual at one time, requires significant cognitive facilities such as performing calculations, making financial decisions, dealing with financial institutions, and managing one's personal checking and/or savings accounts. In addition, managing one's finances independently requires a level of psychological stability that indicates that an individual will make decisions in their own best interests, which is particularly relevant in a case with allegations of mental impairments. The undersigned gives the opinion that the claimant has the psychological and cognitive ability to manage their own funds great weight given the findings upon the examination, the documented longitudinal treatment history, and the claimant's own admissions to the examiner, and finds that this opinion is consistent with a nonsevere mental impairment.

Ongoing records support that the claimant was noted to have a normal mood and affect and exhibiting age appropriate behavior (Exhibit 11F/15; 12F/15). He was noted to appear in a "daze" in February 2018; however, by March he again was exhibiting normal behavior, normal mood and affect, and a normal thought content (Exhibit 12F/22, 28). The claimant sought counseling beginning in September 2018, though while he was noted to have a depressed mood, he exhibited good eye contact, good impulse control, good insight and normal judgment (Exhibit 17F/24). The claimant also exhibited cognition and memory within normal limits (Id.). The following month he reported his depression was related to situation factors of his homelessness, though his appearance was within normal limits, he was making average eye contact, was cooperative, with clear speech, logical thought processes, normal cognition and average intelligence, and normal insight (Exhibit 18F/27-29). While he was noted to have impaired ability to make reasonable decisions, he was also noted to have judgment within normal limits.

In January 2019, the claimant also reported he had lost his medication, and had not taken it in "some time" (Exhibit 18F/1). The claimant's non-compliance with medication is inconsistent with his allegations of disabling medical impairments and symptoms. It is reasonable to

assume that the claimant would be willing to comply with prescribed medical regimen in order to alleviate discomforting symptoms. In addition, the claimant continued to receive counseling for issues related to his housing instability, though was often noted to be friendly and cooperative, with appropriate dress and grooming, and making eye contact, inconsistent with his alleged difficulties in getting along with others (Exhibit 18F).

The claimant underwent another psychiatric consultative examination on April 30, 2019 with Henry Fine M.D. who opined that the claimant would have no limitations in the ability to understand, remember and carry out instructions; no limitations in the ability to interact appropriately with supervisors, co-workers, and the public; no limitations in the ability to respond to changes in a routine work setting, and would have no other capabilities affected by his depressive disorder (Exhibit 20F). This opinion is found to be persuasive when considering the longitudinal treatment history and mental status exam findings, the medication non-compliance, the opinion of the prior consultative examiner, and the objective signs and reports discussed in Dr. Fine's report. During the exam, Dr. Fine noted the claimant had neat grooming, appropriate dress, and came alone by train to the exam (Id.). He was described as cooperative with a good attitude, and a normal posture and gait (Id.). Dr. Fine noted the claimant exhibited clear and understandable speech, normal psychomotor activity, and no abnormalities of thought process (Id.). While the doctor noted issues with fund of knowledge and immediate memory, there were no issues with recent or remote memory, and the claimant was able to perform calculations and expressed an understanding of abstract ideas (Id.). Dr. Fine noted in his summary that there was no clear indication for any functional impact from the depression, and again opined that he could manage funds in his own best interest, which is also found to be persuasive for the reasons similar to the prior consultative examination. As such, the undersigned finds the evidence supports the claimant has no impairment from the depression.

In making this finding, the undersigned has considered the four broad areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four areas of mental functioning are known as the "paragraph B" criteria. The first functional area is understanding, remembering, or applying information. In this area, the claimant has no limitation. The claimant testified he rides the CTA Blue Line train at night, and spends his time at the Harold Washington Library, reading and using the computers for social media

(Hearing Testimony). The undersigned notes this suggests the ability to function in a public setting, and the cognitive ability to plan a route, read, and use a computer. In addition, the claimant did not report any difficulty with paying attention, despite reporting issues with concentration, and did not indicate any problems with following written or spoken instructions (Exhibit 5E). At the internal medicine consultative examination on October 23, 2017, the claimant was noted to be able to relate a clear, concise, coherent medical history without apparent cognitive difficulties (Exhibit 5F). Treatment notes have indicated logical thought processes, normal cognition and average intelligence, and normal insight (Exhibit 18F/27-29).

The next functional area is interacting with others. In this area, the claimant has no limitation. While he alleged issues getting along with others, he did not report problems getting along with authority figures, suggesting an ability to respond to supervision in a workplace setting (Exhibit 5E). He testified that he rides the CTA Blue Line train at night, and spends his time at the Harold Washington Library (Hearing Testimony). The undersigned notes this suggests the social ability to function in a public setting (Id.). At the internal medicine consultative examination on October 23, 2017, the claimant was noted to be appropriate, polite, pleasant and cooperative and overall effort and cooperation were good with appropriate eye contact (Exhibit 5F). The claimant's treating providers overall do not indicate that the claimant has any particular difficulty getting along with others in the treatment setting (with either staff or other clients). While he was noted to have a depressed mood, he exhibited good eye contact, good impulse control, good insight and normal judgment (Exhibit 17F/24). Dr. Fine noted the claimant exhibited clear and understandable speech, normal psychomotor activity, and no abnormalities of thought process (Exhibit 20F). While the doctor noted issues with fund of knowledge and immediate memory, there were no issues with recent or remote memory, and the claimant was able to perform calculations and expressed an understanding of abstract ideas (Id.).

The third functional area is concentrating, persisting, or maintaining pace. In this area, the claimant has no limitation. Despite alleging significant limitations, the claimant also reported he is able to attend to a strict schedule for the shelter, prepare his own meals, and go out independently (Exhibit 5E). In addition, the claimant did not report any difficulty with paying attention, despite reporting issues with concentration, and did not indicate any problems with following written or spoken instructions (Id.). The claimant also testified that he is able to use public transportation, arriving to the hearing by train suggesting

the necessary concentration and persistence to execute and plan a course of travel (Hearing Testimony). Both psychological medical examiners opined that the claimant could manage his own funds, suggesting the ability to concentrate, persist, or maintain pace in handling his own funds (Exhibit 6F; 20F).

The fourth functional area is adapting or managing oneself. In this area, the claimant has no limitation. While considering the period of homelessness, the claimant also reported he is able to attend to a strict schedule for the shelter, prepare his own meals, and go out independently (Exhibit 5E). While alleging problems with shopping and handling money due to a lack of funds, he did not report these issues were due to symptoms or limitations from his medically determinable impairments (Id.). In addition, the claimant did not report any difficulty with handling stress or changes in routine (Id.). At the January 2018 psychological consultative examination, the claimant reported he arrived by train, was self-sufficient for personal care, could do simple tasks on the computer, could perform his own shopping, and was currently looking for work (Exhibit 6F/2-3). Ongoing records support that the claimant was noted to have a normal mood and affect and exhibiting age appropriate behavior (Exhibit 11F/15; 12F/15). The following month he reported his depression was related to situation factors of his homelessness, though his appearance was within normal limits, he was making average eye contact, was cooperative, with clear speech, logical thought processes, normal cognition and average intelligence, and normal insight (Exhibit 18F/27-29).

Because the claimant's medically determinable mental impairment causes no more than "mild" limitation in any of the functional areas, it is nonsevere (20 CFR 404.1520a(d)(1) and 416.920a(d)(1)).

In making these findings, the undersigned has also considered the "paragraph B" criteria of the State Agency psychological consultants at the initial and reconsideration levels, who found the evidence did not support the existence of a severe mental impairment (Exhibit 1A; 2A; 5A; 6A). The undersigned notes that these qualified professionals with program knowledge when assessing similar areas of functioning including understanding, interacting with others and maintaining concentration, persistence, or pace, and adaptation, found no moderate or marked limitations, generally consistent with the clinical evidence at the hearing level to the extent that no moderate or marked limitations are found than assessed herein. The State Agency psychological consultants did not examine the claimant, yet the undersigned finds their opinion persuasive as they provided specific reasons for their

opinions showing that the opinions were grounded in the evidence in the case record available at the time and the claimant's allegations about the claimant's symptoms and limitations. However, it is noted that the psychiatric evaluation with Dr. Fine was found to be more persuasive in finding no limitations based upon that exam and the totality of the evidence available at that later time as discussed above.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

[18-1] 18-21.

Finally, the ALJ returned to the lack of depression-related limitations in his discussion of plaintiff's RFC:

The claimant's activities of daily living during the period relevant to this adjudication have not been supportive of or consistent with the alleged symptoms or limitations. In a Function Report completed during the alleged period of disability, despite alleging significant limitations the claimant also reported he is able to attend to a strict schedule for the shelter, prepare his own meals, and go out independently (Exhibit 5E). While alleging problems with shopping and handling money due to a lack of funds, he did not report these issues were due to symptoms or limitations from his medically determinable impairments (Id.). The undersigned does not consider these activities to be conclusive evidence the claimant can sustain the demands of full-time work activity, but finds that, when viewed in combination with the objective evidence and the claimant's course of treatment; they demonstrate an ability to perform significant activity on a regular and continuing basis.

In addition, the claimant did not report any difficulty with paying attention, despite reporting issues with concentration, and did not indicate any problems with following written or spoken instructions (Id.). He did not report any problems with handling stress or changes in routine (Id.). While he alleged issues getting along with others, he did

> not report problems getting along with authority figures, suggesting an ability to respond to supervision in a workplace setting (Id.). The claimant also testified that while he lacks the facilities due to his housing issues, he is able to shower, and use public transportation, arriving to the hearing by train (Hearing Testimony). He stated that he rides the CTA Blue Line train at night, and spends his time at the Harold Washington Library, reading and using the computers for social media (Id.). The undersigned notes this suggests the ability to function in a public setting, and the cognitive ability to plan a route, read, and use a computer. In addition, while he reported he mainly types with the right hand and has limitations with the use of a mouse for over an hour, the regular use of a computer suggests greater fine dexterity than alleged (Id.). The undersigned finds that the nature of these reported activities are internally inconsistent, and inconsistent with the allegations of severe pain and disabling symptoms made in connection with this application.
>
> The undersigned further notes that the claimant's relatively inconsistent work history does not add significant probative weight to his allegations concerning his inability to sustain regular and continuing work. The record indicates that the claimant stopped working due to the ending of a temporary assignment rather than because of the allegedly disabling impairments, which raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments (Exhibit 3E/2).
>
> The objective medical evidence also does not document clinical findings of physical or mental status abnormality that establish total disability, as defined by the Social Security Act, or that corroborate the degree of symptomology and limitation the claimant has alleged in support of the application since August 31, 2016[.]

[18-1] 27.

The ALJ's handling of plaintiff's depression provides no basis for a remand. To begin with, any error by the ALJ in finding that the depression was a non-severe impairment was not a legal error because the ALJ continued with the five-step sequential analysis and addressed, at great length, whether plaintiff's depression caused work-related limitations. *See Curvin*, 778 F.3d at 649; *Frank R.*, 2021 WL 4264386, at *7. As discussed below, moreover, the ALJ's decision that plaintiff's depression caused no mental limitations had a substantial basis in the evidence.

Plaintiff first argues that the ALJ relied on "superficial and non-contextual readings of the evidence" when he gave great weight to the opinions of two mental-

13

health specialists, psychologist Kathryn Wheeler and psychiatrist Henry Fine, who found that plaintiff was capable of managing his own funds. [19] 11. According to plaintiff, the ALJ's reasoning was unsound because plaintiff's decision-making and ability to manage his financial affairs was not at issue in the case. *See* [*id.*]. To support that claim, plaintiff relies on the ALJ's questioning of the vocational expert (VE), which, according to plaintiff, focused not on his ability to manage funds or make decisions, but on his ability to maintain an appropriate production pace and interact with others. *See* [18-1] 68-72 (VE's testimony).

The Court rejects this argument for several reasons. To begin with, the ALJ's evaluation of Dr. Wheeler's and Dr. Fine's opinions was subject to 20 C.F.R. § 404.1520c(a)-(c), which required the ALJ to consider the supportability of their opinions, their consistency with other evidence in the record, and multiple other factors. But plaintiff does not argue that the ALJ erred in evaluating these opinions– nor, for that matter, does plaintiff make any challenge to the ALJ's handling of *any* of the opinion evidence that addressed his depression. *See* [19] 10-14. Nor is the Court persuaded that plaintiff's general decision-making ability was irrelevant or that the ALJ could not consider Dr. Wheeler's and Dr. Fine's shared opinion that plaintiff could manage his finances as probative evidence of plaintiff's mental functioning. To the contrary, at least one of the paragraph B criteria discussed by the ALJ–the ability to understand, remember, or apply information–is clearly bound-up with plaintiff's decision-making abilities. Plaintiff has not cited any authority, moreover, holding or suggesting that a claimant's ability to manage his finances is categorically irrelevant to the claimant's functional abilities. *See* [19] 11. Whether this Court or another ALJ would have given this evidence the same weight that the ALJ did here is simply not relevant to whether the ALJ's decision was supported by substantial evidence. *See Spring W. v. Saul*, Case No. 20 C 1864, 2021 WL 2529615, at *2 (N.D. Ill. Jun. 21, 2021) ("In reviewing an ALJ's decision, the Court may not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ."). Finally, plaintiff does not explain why the ALJ's posing of a hypothetical that asked the VE to assume that plaintiff was limited in his ability to maintain a production pace or interact with others demonstrates that plaintiff's ability to manage finances or make decisions was irrelevant. Indeed, the fact that the ALJ did not pose a hypothetical positing that plaintiff had a limited or impaired ability to make decisions is consistent with the ALJ's conclusion that plaintiff's depression caused no work-related limitations.

Plaintiff next argues that the ALJ erred by finding that his "non-compliance with medication is inconsistent with his allegations of disabling medical impairments and symptoms." [18-1] 19. In reviewing the record, the ALJ observed that plaintiff reported during a psychiatric office visit in January 2019 that "he lost his medication and has not taken it for some time." [*Id.*] 761. The treatment note goes on to explain, however, that plaintiff "has been unable to get a refill because it is too early to fill it," and that plaintiff's treater had agreed to contact both his insurance carrier and his

14

pharmacy to attempt an "override" so that plaintiff could receive an interim supply of medication. [*Id.*]. Without specifically discussing that part of the treatment note, the ALJ inferred that, had plaintiff been interested in "alleviat[ing] discomforting symptoms," he would have been "willing to comply with prescribed medical regimen[.]" [18-1] 19. As plaintiff correctly notes, an ALJ may not draw a negative inference from a claimant's noncompliance with treatment "unless the ALJ has explored the claimant's explanations for the non-compliance." *Peter W. v. Kijakazi*, No. 21-cv-1552, 2022 WL 3684631, at *2 (N.D. Ill. Aug. 23, 2022). Here, it is not as clear to the Court as it is to plaintiff that the ALJ failed to consider why he had not complied with his prescribed medication: the ALJ obviously reviewed the treatment note in which the explanation was contained and drew a negative inference about the alleged severity of plaintiff's depression, but he did not specifically mention the explanation itself. In these circumstances, the Court will assume, *arguendo*, that the ALJ failed to consider why plaintiff had not complied with his prescribed treatment. But the Court concludes that this error, standing alone, does not warrant a remand because, as discussed immediately below, a substantial–and nearly overwhelming,– body of evidence supported the ALJ's decision that plaintiff's depression caused no work-related mental limitations.

Plaintiff challenges the ALJ's finding that he had no limitations in the areas of understanding, remembering, and applying information; in interacting with others; in concentrating, persisting, or maintaining pace; and in managing or adapting oneself. *See* [19] 12-14. Plaintiff's various arguments on this score all fail, however, because they essentially ask the Court to reweigh the evidence, which the Court cannot do. *Spring W.*, 2021 WL 2529615, at *2; *see also Victor M. v. Kijakazi*, No. 20-cv-7073, 2022 WL 2105893, at *8 (N.D. Ill. Jun. 10, 2022) (courts must "read[ ] the ALJ's decision as a whole and giv[e] it a commonsensical reading rather than nitpicking at it"). For example, plaintiff faults the ALJ's finding that he had no limitations in understanding, remembering, and applying information because the ALJ unduly relied on plaintiff's testimony that he was able to "ride the CTA at night." [19] 12. But the ALJ reasoned that this testimony, combined with plaintiff's further testimony that he regularly visited the library to read and use the computers there for social media, was evidence of "the cognitive ability to plan a route, read, and use a computer." [18-1] 20. Plaintiff does not explain why the ALJ was forbidden to consider this evidence as probative of his ability to understand, remember, and apply information. Nor is there merit to plaintiff's claim that the ALJ "failed to address [his] reports of depressive symptoms," including statements in an October 1, 2018 treatment note that plaintiff felt helpless and unmotivated. [19] 12-13 (citing [18-1] 787]. The ALJ specifically discussed this treatment note while analyzing plaintiff's ability to use, remember, and apply information. *See* [18-1] 20 (citing [*id.*] 787-89). Finally, the ALJ's finding was not based solely on plaintiff's ability to use public transportation and public libraries. The ALJ had given great weight to Dr. Wheeler's opinion that plaintiff could manage his finances because it was indicative of "significant cognitive facilities such as performing calculations" and "making

15

financial decisions." [*Id.*] 18. And the ALJ had also found "persuasive" the opinion of Dr. Fine that "there was no clear indication for any functional impact from [plaintiff's] impression" and had "no limitations in the ability to understand, remember and carry out instructions[.]" [18-1] 19, 813, 815-16. Plaintiff does not acknowledge that opinion or mount any challenge to the ALJ's evaluation of it.

Regarding the ALJ's finding that plaintiff had no limitations in interacting with others, plaintiff again argues that the ALJ should not have relied on his ability use public transportation at night. This is so, plaintiff argues, because the analysis "ignores that the Plaintiff rides the CTA at night because he sleeps on the street" and is homeless. [19] 13. Plaintiff also insists that his use of public libraries and documented ability to interact appropriately with treaters was irrelevant because the ALJ did not "demonstrate how this applies to, or is analogous to, work." [*Id.*]. Again, plaintiff is simply asking the Court to draw its own conclusion as to the significance of plaintiff's ability to use public transportation. In any event, the ALJ repeatedly noted that plaintiff used public transportation, not just at night as a form of temporary shelter, but also to make lengthy trips to medical appointments and even the hearing with the ALJ. *See* [18-1] 18 (noting that plaintiff "arrived by train" for January 2018 psychological consultative exam); [*id.*] 811 (Dr. Fine observing that plaintiff "came alone to the exam center on the train" for April 2019 psychiatric evaluation, "arriving early after about a 40-minute trip"); [*id.*] 20 (noting that plaintiff used public transportation to attend hearing). This evidence permitted the ALJ to infer that plaintiff was able to interact appropriately with others, and "[t]he Court considers this evidence to be enough to satisfy the minimum level of articulation required of the ALJ in supporting [his] determination that Plaintiff's RFC should include no mental limitation" regarding the ability to interact with others. *Kathleen C. v. Saul*, 19 C 1564, 2020 WL 2219047, at * 4 (N.D. Ill. May 7, 2020). Plaintiff then faults the ALJ for not translating his ability to use public transportation to the work setting, but he does not dispute that a claimant's ability to interact with others outside the workspace is relevant. In any event, the ALJ also found persuasive Dr. Fine's opinion that plaintiff had no limitations in his "ability to interact appropriately with supervisors, co-workers, and the public" [18-1] 816, a finding that plaintiff does not acknowledge, let alone persuasively contest. Finally, the ALJ accurately noted that, while plaintiff claimed that his depression made it difficult to get along with others, "he did not report problems getting along with authority figures," which "suggest[ed]" to the ALJ "an ability to respond to supervision in a workplace setting. [*Id.*] 20; *see also* [*id.*] 235. All of this was substantial evidence that supported the ALJ's determination that plaintiff was not limited in his ability to interact with others.

As for plaintiff's ability to concentrate, persist, or maintain pace, plaintiff acknowledges that the ALJ relied on his "ability to make food, go to a homeless shelter, go outside independently," use "the train to travel," and independently manage his finances. [19] 13. But plaintiff faults the ALJ for "intrinsically ignoring

16

the fact that [he] is homeless" and disregarding other findings that plaintiff had low energy during the January 2018 psychological examination and his report that his sleep was only "so-so." [*Id.*]. To begin with, plaintiff's argument that the ALJ somehow ignored the undisputed fact of his homelessness is impossible to square with the ALJ's decision itself, which repeatedly refers to plaintiff's homelessness, or the administrative hearing, where this issue was addressed multiple times. Furthermore, in discussing plaintiff's abilities in this area, the ALJ expressly mentioned plaintiff's need to visit a shelter. [18-1] 20. Moreover, the ALJ twice acknowledged that plaintiff had occasionally displayed a depressed or dysphoric mood, *see* [*id.*] 18-19, including during the January 2018 psychological exam. In any event, plaintiff does not explain how the fact that he displayed a sad mood and poor sleep translates to a medically supportable limitation that the ALJ had to include in the RFC. *See Kathleen C.*, 2020 WL 2219047, at * 4 ("While Plaintiff makes much of the fact the ALJ did not mention Plaintiff's flat affect and depressed mood at sessions with Ms. Dearbone-Collins (the same sessions where Plaintiff consistently demonstrated normal functional abilities), Plaintiff fails to hypothesize as to what kinds of work restrictions might address her depression."). Indeed, despite plaintiff describing a "sad mood" and "low energy" during his April 2019 psychological evaluation with Dr. Fine, *see* [18-1] 811, Fine concluded that plaintiff's depression caused no functional limitations whatsoever, and the ALJ found this opinion to be persuasive based on "the longitudinal treatment history and mental status exam findings," the "opinion of the prior consultative examiner [*i.e.*, Dr. Wheeler], and the objective signs and reports discussed in Dr. Fine's report." [*Id.*] 19.

And with respect to the ALJ's finding that plaintiff was not limited in his ability to adapt or manage oneself, plaintiff contends that the ALJ ignored evidence that plaintiff had relied on his doctors to help him obtain bus passes and arranging transportation. [19] 14 (citing [18-1] 763, 769). Again, it is not clear to the Court that the ALJ actually "ignored" this evidence. Both of the treatment notes plaintiff relies on were contained in Group Exhibit 18F, and the ALJ specifically discussed several treatment notes in that Group Exhibit, including when commenting that plaintiff was receiving counseling for issues related to his housing instability. *See* [18-1] 19. In any event, the ALJ was "not required to discuss every snippet of information from the medical records that might be inconsistent with" his finding that plaintiff was not limited in his ability to adapt or manage oneself. *Nicholas C. v. Kijakazi*, No. 21 C 244, 2023 WL 6160160, at *3 (N.D. Ill. Sept. 21, 2023) (internal quotation marks omitted). That is especially so here, where the ALJ relied on substantial evidence–plaintiff's ability to adhere to the homeless shelter's schedule, venture out from the shelter independently, and consistently use public transportation to attend medical appointments–of plaintiff's functional abilities and on Dr. Fine's unchallenged opinion that plaintiff's depression caused no work-related limitations. The ALJ also noted that Dr. Wheeler found that plaintiff was "self-sufficient for personal care." [18-1] 470. In sum, the Court finds that the ALJ built the required "accurate and logical

17

bridge between the evidence and [his] conclusion" that plaintiff's ability to adapt or manage himself was not limited. *Nicholas C.*, 2023 WL 6160160, at *2.

For these reasons, the Court rejects plaintiff's second ground for reversing and remanding the ALJ's decision.

### III. The ALJ Accounted For All Work-Related Limitations When Questioning The Vocational Expert.

Finally, plaintiff argues that the ALJ erred in determining his RFC because, in questioning the VE, the ALJ posed a hypothetical question that did not account for all of plaintiff's work-related limitations. [19] 15. This argument lacks merit.

As plaintiff notes, the ALJ's first hypothetical question asked the VE to assume that the claimant had an RFC that was identical to plaintiff's ultimate RFC in terms of exertional abilities, but with the additional restriction that the claimant "would have difficulty tolerating jobs requiring significantly higher than average pace" and could only handle "occasional interaction with [the] public and coworkers." [18-1] 70. The VE testified that such a claimant could perform only one job, food distributor, for which there were only 1,758 jobs. [*Id.*]. The ALJ posed a second hypothetical that was identical to the first, but which eliminated the pace restriction. [*Id.*] 70-71. The VE responded that such a claimant could perform only the food distributor job. [*Id.*] 71. Finally, the ALJ posed a third hypothetical that, like plaintiff's ultimate RFC determination, included no non-exertional or social limitations. [*Id.*]. The VE responded that such a claimant could work as a food distributor, counter clerk, and furniture rental clerk, which were the same jobs that the ALJ found plaintiff could perform. [*Id.*] 71-72.

"An ALJ must include in his hypothetical question all of a claimant's limitations supported by the medical record." *Durham v. Kijakazi*, 53 F.4th 1089, 1096 (7th Cir. 2022) (internal quotation marks omitted). Here, the ALJ reasonably found, based on substantial evidence, that neither plaintiff's left-knee impairment nor his depression caused any work-related limitations. Accordingly, the ALJ did not err in posing hypothetical questions to the VE. *See id.* (rejecting argument that ALJ erred by failing to include an off-task limitation in hypothetical to VE because "there is no evidence in the record to support a time-off-task limitation"). Furthermore, the fact that the ALJ "consider[ed] adding a mental limitation to [plaintiff's] RFC does not establish that such a limitation is ultimately warranted. In fact, it is not reversible error where the hypothetical question posed to the VE was more restrictive than the limitations the ALJ ultimately assigned to the claimant." *Kathleen C.*, 2020 WL 2219047, at * 6.

For these reasons, plaintiff's third ground for reversing and remanding the ALJ's decision fails.

## Conclusion

For the reasons set forth above, plaintiff's motion to reverse and remand the SSA's decision is denied [19], defendant's motion to affirm the ALJ's decision [24] is granted, and the SSA's decision denying plaintiff's applications is affirmed.

_____
**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: March 4, 2024**